**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| TERRY V.,[1]<br><br>Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No. 25-CV-3044-CJW-KEM<br><br>**REPORT AND RECOMMENDATION** |

---

Plaintiff Terry V. seeks judicial review of the Commissioner of Social Security's denial of applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f). Plaintiff argues the administrative law judge (ALJ), Erin T. Schmidt, erred in evaluating the medical opinions. I recommend **affirming** the Commissioner's decision.

## *I. BACKGROUND*

Plaintiff graduated high school in 2003 and has a steady work history. AR 193, 312. He worked as a janitor for almost ten years, then part-time at a department store stocking shelves, then unloading trucks for a cold storage company. AR 45-46, 300-04, 341-46.[2] In 2022, he began working the line at a meatpacking plant, which required

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] "AR" refers to the administrative record below, filed at Doc. 14.

being on his feet all day and grabbing pigs weighing thirty to sixty-five pounds. He worked there full-time until his leg injury.

On June 3, 2023, Plaintiff went to the ER[3] after drunkenly falling down the stairs while carrying a large arcade game, hitting his head and losing consciousness, and injuring his right leg. AR 584-87. A head CT[4] scan was normal, but the right-leg x-ray showed a fractured tibia. The ER provider believed Plaintiff needed "surgical intervention sooner than later," and he was transferred to the ER from Manning, Iowa (his hometown), to Sioux City, Iowa (a larger city). Two orthopedic surgeons operated on Plaintiff's knee. On June 3, 2023, Steven Stokesbary, MD, performed a temporary right leg external fixation spanning the femur and tibia. AR 379, 417-18. And on June 12, 2023, Joshua Hockett, DO, repaired the right tibial plateau fracture and a meniscus tear. AR 379, 413-15. After surgery, Dr. Hockett instructed Plaintiff to remain off his right leg for twelve weeks and always wear a brace. On June 13, 2023, Plaintiff filed his claims for DI and SSI benefits, alleging disability since June 3 due to "rheumatoid arthritis, back problem, and [right] leg problem." AR 67.

On June 27, 2023, Plaintiff met with Dr. Stokesbary at his outreach clinic in Manning. AR 403. Plaintiff reported overall doing okay, trying to stretch his pain medication so he did not take it every day, and using crutches. On objective examination, Dr. Stokesbary noted Plaintiff was able to flex his ankle and toes, with a little femoral weakness with dorsiflexion and extension of his toes. Dr. Stokesbary thought his surgical wound was healing well. Dr. Stokesbary instructed Plaintiff to continue no weightbearing status but said Plaintiff could "start working on range of motion of his ankle." Dr. Stokesbary told Plaintiff to follow up in three weeks, and if his x-rays looked good at that time, he would start physical therapy. Dr. Stokesbary anticipated Plaintiff would be

[3] Emergency room.

[4] Computed tomography.

off work for an additional ten to twelve weeks and possibly need light duty when he returned.

Plaintiff saw Dr. Stokesbary on July 20, 2023. AR 401. Plaintiff reported "overall doing okay" and "improving" with less pain, although he still took some pain medication. On objective examination, Dr. Stokesbary observed mild swelling in his calf and "fairly significant" swelling in his foot, negative Homans' sign, good flexion of the toes and ankle, "little bit of a flicker of ankle dorsiflexion and EHL," and weakness "in this area." Dr. Stokesbary recommended a compression stocking and physical therapy to work on "range of motion and gentle weightbearing." He instructed him to follow up in four weeks.

In early August 2023, Defendant experienced drainage and possible infection at his surgical incision site, and he was prescribed antibiotics. AR 395-96. On August 8, 2023, Dr. Stokesbary observed some improvement in Plaintiff extending his ankle, and Plaintiff noted no increase in pain and making progress in physical therapy with the ability to put weight on his leg. AR 395.

During another appointment on August 14, 2023, a provider with Dr. Stokesbary's office noted that due to transportation issues, Plaintiff had not followed up with Dr. Hockett since his surgery two months prior and instead had been following with Dr. Stokesbary at his Manning clinic (where Plaintiff resided). Plaintiff reported using crutches to get around, although his physical therapist was encouraging him to start walking again. The provider noted Plaintiff had a footdrop with no significant improvement. On objective examination, the provider observed weakness with knee extension but "he can get to near-full extension" with assistance, some foot swelling, "active plantarflexion at the ankle and digits but no significant active dorsiflexion," and intact sensation to light touch. X-rays showed intact hardware and somewhat fading fracture lines. The provider concluded Plaintiff's infection appeared "superficial" and did not spread to underlying bone or hardware. The provider also noted his "slow-to-

heal wound" and suggested "continu[ing] with just toe-touch weightbearing to the right lower extremity" and "physical therapy for gentle strengthening and aggressive knee range-of-motion exercises." The provider also ordered an EMG[5] and nerve conduction study to assess Plaintiff's peroneal nerve injury (which Plaintiff requested be performed closer to home).

On August 17, 2023, Plaintiff met with Dr. Stokesbary. AR 426. Plaintiff reported improved pain and redness. Dr. Stokesbary's objective examination was unremarkable, and he directed Plaintiff to continue antibiotics and follow up in three to four weeks.

Plaintiff underwent the EMG and nerve conduction study on September 8, 2023. AR 377-78, 384-87. He then followed up with Dr. Stokesbary on September 12, 2023. AR 575. Plaintiff said he was doing better and no longer using pain medication. Dr. Stokesbary noted the EMG confirmed injury to the peroneal nerve and that Plaintiff had "a little bit of movement of his ankle with dorsiflexion but [was] still quite weak." Dr. Stokesbary additionally found Plaintiff could "nearly fully extend" his knee and "flex easily to 100," with some pain on examining his calf. An x-ray of his right leg looked like previous imaging, with fracture lines still visible. AR 425. Dr. Stokesbary concluded "[t]hings are improving" with Plaintiff "doing pretty well," although he still had weakness and stiffness throughout his leg. Dr. Stokesbary directed Plaintiff to continue physical therapy and progress to more weightbearing to "slowly" return to full weightbearing.

On September 16, 2023, Plaintiff went to the ER due to increased redness in his leg. AR 420-23. He reported being up more with physical therapy the day before and more swelling, but no increase in pain. Plaintiff's labs were normal and did not indicate

---

[5] Electromyography.

infection. The provider declined to start antibiotics and posited that the redness was due to swelling (from increased weight bearing) rather than infection.

Plaintiff attended thirty-five physical therapy sessions from July 26, 2023, through October 22, 2023. AR 463-489. The October 2023 summary reflects complications with his recovery due to MRSA infection and peroneal nerve damage, but overall, "slow but steady progress." The physical therapist noted Plaintiff was able to walk with a cane, with "mild to moderately aberrant gait pattern as he fatigues with exercise or prolonged . . . distances." Plaintiff had steadily gained strength but still lacked "adequate quad strength" to "safely transition away from" the cane or go up and down stairs with his right leg. The physical therapist noted good progress with his knee range of motion, with possible max improvement, and continued deficits with ankle range of motion due to the nerve injury. The physical therapist believed Plaintiff could continue to benefit from physical therapy. He had not yet met his long-term goal of being able to stand and walk for four hours without difficulty.

On October 22, 2023, Plaintiff completed a function report for the Social Security Administration. AR 317-24. He stated that he could not stand or walk for long periods of time. He described attending physical therapy appointments and helping to clean the house with breaks to sit. He said he had to sit on the toilet while shaving and needed help putting his shoes on. He reported making simple meals like sandwiches but not standing over the stove. He said he could fold laundry, which he did while sitting for twenty minutes daily. He also said he could sometimes do the dishes for thirty minutes, but sometimes he had to take a break from standing. He could not drive a car due to his issues with his leg.[6] Hobbies included watching television, lifting weights, going for walks, and playing with his children, but he said he could not currently lift weights or

---

[6] He testified at the hearing that he lost his driver's license in 2023 due to a driving under the influence offense. AR 44.

run after his children, and he had just started walking again. He checked boxes indicating he had issues with lifting, squatting, bending, standing, walking, sitting, kneeling, and stair climbing, explaining he could not put pressure on his right leg.

On October 31, 2023, Plaintiff met with Dr. Stokesbary. AR 493. Plaintiff reported "doing pretty well," "ambulating with a cane," and walking "full weightbearing around the house." He could move his ankle "a bit better" but still had weak toe extension. On objective examination, Dr. Stokesbary noted improved swelling, near full knee movement, improved ankle dorsiflexion, and good flexion, but minimal toe extension and walking "full weightbearing . . . with a limp." Dr. Stokesbary instructed Plaintiff to continue physical therapy but starting to "wean . . . out of that" and to return in two months.

On December 4, 2023, the Social Security Administration denied Plaintiff's disability applications on initial review. AR 66-79. In connection with that determination, state agency consultant Jerry Flatt, DO, reviewed the treatment records and other evidence of record and opined as to Plaintiff's physical residual functional capacity (RFC). AR 69-71. Dr. Flatt found Plaintiff could sit, stand, and walk for six hours in an eight-hour workday; occasionally lift ten pounds and frequently lift twenty pounds; occasionally climb stairs, balance, stoop, kneel, and crouch; never crawl or climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to hazards such as heights and machinery. Dr. Flatt noted Plaintiff fractured his right tibia in June and that it was "medically reasonable to expect continued improvement with anticipation that by one year from the onset he will be capable of the RFC provided."

On December 26, 2023, Plaintiff was discharged from physical therapy after fifty-two visits. AR 499-503; *see also* AR 504-15, 546-69. The discharge summary states he achieved his three long-term goals: the ability to ambulate at least 1,000 feet without a cane and "minimal to no gait deviation"; the ability to ascend and descend stairs reciprocally with minimal to no difficulty; and the ability to "stand/walk for at least 4

hours with minimal to no difficulty." The physical therapist further noted he had "no difficulty" standing," "mild difficulty" squatting because he "offloads" his right leg; and "mild difficulty" walking, as he used a cane at home and could "go without outdoors but starts limping and fatigues." Plaintiff denied pain in his right knee and ankle. At physical therapy sessions in December, Plaintiff had reported walking outdoors and going to the rec regularly. On objective examination at discharge in late December, the physical therapist observed Plaintiff walked without an assistive device, had decreased knee extension, leaned to the right "due to quad weakness," and had "mild offloading of [right leg] in static stance" but was able to correct with cuing. Plaintiff's right leg only had a few degrees less range of motion than his left leg. His functional outcome measured 75% maximum function with his right leg.

On January 23, 2024, Plaintiff had an appointment with Dr. Stokesbary. AR 540-41. He reported walking with a limp without a cane and feeling like he could return to work. He said his pain was minimal, but he was a little "stiff and sore and achy with rest." On objective examination, Dr. Stokesbary noted knee range of motion from -4 to 110 degrees and "pretty good" ankle range of motion with a little bit of "residual weakness with dorsiflexion and EHL." Dr. Stokesbary additionally noted minimal edema. An x-ray showed his fracture to be well-healed. Dr. Stokesbary said to continue home exercises and cleared Plaintiff to return to work the next week.

On January 24, 2024, the Social Security Administration denied Plaintiff's disability applications on reconsideration. AR 80-95. State agency medical consultant Donald Shumate, DO, evaluated Plaintiff's RFC and largely adopted Dr. Flatt's findings, but found Plaintiff could only stand or walk for two hours in an eight-hour workday. Dr. Shumate noted that Plaintiff alleged a changed condition as of September 2023, since a nerve test showed severe nerve damage to Plaintiff's right knee, and that his discharge from physical therapy in December 2023 suggested he was "somewhat plateauing overall."

On February 22, 2024, Plaintiff had an appointment with Dr. Stokesbary, complaining about pain in his *left* knee. He said he started noticing this pain after returning to work four weeks prior and being more mobile and active. Plaintiff said it felt like his knee "catches and wants to give out." He reported using Tylenol, anti-inflammatories, and pain medication, which was not helping. His primary care provider had obtained x-rays, which were negative. On objective examination, Dr. Stokesbary noted tenderness over the lateral joint line, distal iliotibial band region, and lateral hamstring tendon; full flexion and extension; no obvious crepitus; pain with hyperextension; a positive Murray's sign; 5/5 strength with knee flexion-extension; no ligamentous instability; no redness or swelling; and normal sensation. Dr. Stokesbary ordered an MRI[7] to further evaluate for internal derangement.

On February 27, 2024, Plaintiff underwent a left knee MRI. AR 538. It showed no tear or internal derangement, but "an intramedullary lesion with the proximal tibial diaphysis," "consistent with an enchondroma."[8]

On March 13, 2024, Plaintiff began physical therapy for his left knee. AR 526-33; *see also* AR 521-25. He reported that after he started working on his feet again, by the end of an eight-hour shift, his left knee felt like it could barely hold him up and would buckle when he tried to walk on it. He said it hurt the most after long periods of standing or walking or with the first few steps. The physical therapist noted signs and symptoms were consistent with medial hamstring dysfunction, possibly related to his significant change in activity level after returning to work. At physical therapy sessions later in March, Plaintiff reported working light duty with no problems. At a physical therapy session in early April 2024, Plaintiff reported that his "knee was a little sore the . . .

---

[7] Magnetic resonance imaging.

[8] Enchondroma is a non-cancerous bone tumor. ***Enchondroma: What Is It, Symptoms, Treatment & Recovery***, The Cleveland Clinic, (Nov. 16, 2021) http://my.clevelandclinic.org/health/diseases/22113-enchondroma.

morning after his last visit but nothing he couldn't handle." AR 704. At another early April physical therapy session, Plaintiff said his pain comes and goes, such that he felt good last week but then had "increased pain 2 days post that tends to linger." He reported feeling "like he could be good enough to return to work but is unsure." He also reported "increased quad fatigue." The physical therapist noted continued improvement of his symptoms with increased weight bearing. And although Plaintiff continued to report intermittent flareups, the intensity of the flare ups was dulling. Plaintiff's last physical therapy session for his left knee was on April 8, 2024. AR 698-703. Plaintiff reported feeling good, walking increased distances, with his worst pain recently a 3/10. He stated walking and standing for long periods aggravated his left knee pain. The physical therapist noted Plaintiff could perform light duty work well. The note reflects Plaintiff "continues to be [more] limited by his [right leg range of motion] deficits than his [left leg]." The physical therapist noted his physical tests showed "improved gain, functional squat, and [lower extremity] strength," although Plaintiff continued to subjectively report minimal progress. The physical therapist discharged Plaintiff to home exercises.

On April 23, 2024, Plaintiff met with Dr. Stokesbary, complaining of pain in his right leg. AR 707. Plaintiff said he had not been able to go back to work full-time and had quit his job, because he was not able to be "SVT 8 hours a day." Plaintiff was able to walk without a cane but had achiness and soreness in his leg and a little swelling in his foot. On objective examination, Dr. Stokesbary observed good range of motion with "some weakness with dorsiflexion of his foot and toe," with no edema and intact sensation. An x-ray of the right leg was similar to prior imaging. AR 602. His symptoms were improving. Dr. Stokesbary concluded the achiness in Plaintiff's leg was to be expected given the extent of his injury. Dr. Stokesbary suggested he might not ever be able to work his physically demanding job and suggested he try "sedentary work or progressively increase standing" over time.

On this same date, Dr. Stokesbary completed a form evaluating Plaintiff's RFC. AR 590-91. Dr. Stokesbary checked boxes indicating that Plaintiff would need to recline or lie down during an eight-hour workday in excess of typical breaks and that he would need unscheduled breaks, four to six times a day for fifteen to thirty minutes. He said Plaintiff could walk less than one city block "without rest or significant pain." He estimated Plaintiff could sit for six hours and stand for two hours in an eight-hour workday. He opined Plaintiff could frequently lift ten pounds, occasionally lift twenty pounds, and never lift fifty pounds. He checked a box indicating Plaintiff would miss work once or twice a month due to his impairments.

The ALJ held a hearing on June 18, 2024, at which Plaintiff and a vocational expert testified. AR 39-54. Plaintiff reported he could not stand for more than two hours due to pain in his right leg and feeling weak like he might fall. He said his pain improved with sitting in a recliner with his feet elevated, as well as with using Icy Hot. He reported using a cane to go up and down stairs and when he had been standing for two hours, because he started to limp. He estimated he could walk around or sit in a normal kitchen or office chair for an hour before experiencing pain. He said he helped with household chores and cooking, but his retired mother-in-law lived a block away and came over to help three to four times a week, since he could not be on his feet as needed to do chores. He reported going on walks with his son and bringing his cane just in case. His landlord did yard work such as shoveling snow and mowing. He wanted to save money for a gym pass to work on losing weight.

The ALJ issued a written decision on July 26, 2024, following the five-step process outlined in the regulations.[9] AR 13-30. The ALJ found Plaintiff had severe impairments

[9] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." ***Grindley v. Kijakazi***, 9 F.4th 622, 628 (8th Cir. 2021)

of "fracture of the right tibia status post open reduction internal fixation with residual peroneal neuropathy at the fibular head on the right; enchondroma of the left knee; and obesity." AR 16. The ALJ determined Plaintiff had the RFC[10] to perform light work[11] with the following additional limitations:

> [H]e can stand and/or walk a maximum of 2 hours in an 8-hour workday. There should be no operation of foot controls to perform the essential functions of the job. There should be no crawling, no kneeling, and no climbing ladders, ropes, or scaffolds. The claimant can occasionally stoop, crouch, balance, and climb ramps or stairs. He can have no exposure to potential workplace hazards such as moving machinery or unprotected heights.

AR 18. The ALJ concluded that Plaintiff could not return to his past work, but could work as an electronics worker, fundraiser, or routing clerk, and was thus, not disabled from June 3, 2023 (the alleged onset date), through July 26, 2024 (the date of the ALJ's decision). AR 29-30.

The Appeals Council denied Plaintiff's request for review on June 11, 2025 (AR 1-5), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[12] Plaintiff filed a timely complaint in this court (Docs. 1, 5).[13] The case was stayed due to a lapse of funding and government shutdown (Doc. 9) and thereafter, briefing deadlines were extended at the parties' requests (Docs. 16-17, 19-22). The parties filed briefs (Docs. 18, 23, 24) and the Honorable C.J. Williams, Chief District

---

(quoting ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)**. The claimant bears the burden of persuasion to prove disability. ***Goff***, 421 F.3d at 790.

[10] Residual functional capacity (RFC) means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)**).

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." **20 C.F.R. §§ 404.1567(b), 416.967(b)**.

[12] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[13] *See* **20 C.F.R. § 422.210(c)**.

Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## *II. DISCUSSION*

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[14] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[15] The court "do[es] not reweigh the evidence or review the factual record de novo."[16] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[17]

Plaintiff argues that the ALJ erred in evaluating the persuasiveness of the medical opinions in the record, from the nonexamining state agency consultants (Drs. Flatt and Shumate) and from Plaintiff's treating orthopedic surgeon, Dr. Stokesbary. For claims filed after March 2017 (like Plaintiff's), the ALJ no longer "assign[s] a specific weight to medical opinions."[18] Instead, the ALJ "evaluate[s] the persuasiveness of medical opinions" considering the following factors: (1) supportability, i.e., "the objective medical evidence and supporting explanations presented by a medical source" in support of his or her opinion; (2) consistency with "evidence from other medical sources and nonmedical sources"; (3) the relationship between the opinion's author and the claimant, such as whether the opinion is from a treating source; (4) whether the medical opinion is

---

[14] ***Grindley***, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[15] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007).

[16] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

[17] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

[18] *Revisions to Rules Regarding the Evaluation of Medical Evidence*, **82 Fed. Reg. 5844**, 5858 (Jan. 18, 2017); *see also* **20 C.F.R. §§ 404.1520c(a), 416.920c(a)**.

by a specialist; and (5) "other factors that tend to support or contradict a medical opinion," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the Social Security Administration's] policies and evidentiary requirements."[19] The first two factors, supportability and consistency, are the most important.[20] The ALJ is required to "articulate how [the ALJ] considered the medical opinions" and "explain how [the ALJ] considered the supportability and consistency factors."[21]

### *A. State Agency Consultants' Opinions*

The ALJ indicated she was "partially persuaded" by Dr. Flatt's and Dr. Shumate's opinions, "as they are partially consistent with the evidence of record." The ALJ explained:

> The findings of Dr. Shumate and Dr. Flatt are well supported with explanation and are largely consistent with the evidence at the time they were issued. Moreover, the findings of Dr. Flatt are largely consistent with the longitudinal record. However, limitations to no kneeling and no operation of foot controls are more consistent with the claimant's functioning and with objective findings. The undersigned has also further limited the claimant to no exposure to potential workplace hazards as a precautionary measure.

AR 26. The ALJ cited specific treatment records in support, in addition to the ALJ's prior summary of the medical evidence. AR 20-26.

Plaintiff argues that the ALJ found the opinions equally persuasive, supported, and consistent, and thus should have discussed other factors such as the sources' relationship with the Plaintiff (none) and their specialization (neither are orthopedists—Dr. Flatt is a

---

[19] **20 C.F.R. §§ 404.1520c(a), (c), 416.920c(a), (c)**.

[20] **20 C.F.R. §§ 404.1520c(a), 416.920c(a)**.

[21] **20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2)**.

family practitioner and Dr. Shumate's specialty is pulmonary (AR 77, 93)). Plaintiff also faults the ALJ for using conclusory statements and failing to explain how the opinions were consistent or inconsistent with the record. Plaintiff also argues reversal is required because the ALJ stated Dr. Flatt's opinion was more "consistent with the longitudinal record" but adopted Dr. Shumate's subsequent and more limited walking and standing findings.

I agree with the Commissioner that the ALJ clearly transposed Dr. Flatt's and Dr. Shumate's names in the opinion—the ALJ described Dr. Flatt's opinion as "affirm[ing]" Dr. Shumate's except as to the ability to stand and walk, when it was actually Dr. Shumate who affirmed Dr. Flatt's opinion except as to standing and walking. AR 26. A typographical-type error is not cause for reversal.

In addition, the ALJ's discussion of persuasiveness should not be considered in a vacuum. Considering the ALJ's overall opinion, the ALJ adequately explained the reasons for finding Plaintiff's ability to stand and walk more limited (as found by Dr. Shumate and not Dr. Flatt). At the time Dr. Flatt issued his opinion, Plaintiff had not yet completed physical therapy, and Dr. Flatt was predicting how Plaintiff would recover; versus Dr. Shumate who had the benefit of additional treatment records. Furthermore, the ALJ adopted all the limitations recommended by Drs. Shumate and Flatt and then some. Thus, any error in failing to properly evaluate their opinions is harmless.[22]

I recommend finding that the ALJ did not err in addressing the persuasiveness of Dr. Flatt's and Dr. Shumate's medical opinions.

---

[22] *See* ***Kaber v. Kijakazi***, No. 4:22-CV-0494, 2023 WL 5821767, at *2 (W.D. Mo. Sept. 8, 2023) ("[A]ny error the ALJ may have made by imposing limitations going above and beyond those recommended by the State agency consultants—something which improved Plaintiff's chances of receiving benefits—is at most harmless error which does not merit reversal or remand.").

### *B. Treating-Source Opinion*

The ALJ described the limitations Dr. Stokesbary included on his checklist form but then noted his treatment record from the same day suggested Plaintiff should try to "find sedentary work" or something where he "progressively increase[d] standing time over the next several months." AR 26-27. The ALJ adopted Dr. Stokesbary's "lifting, carrying, standing, walking, reaching, handling, and fingering limitations" as "supported by [Dr. Stokesbary's] most recent clinical findings" and the "claimant's reports that he is walking without assistance, has little swelling in his foot, and has some achiness and soreness in his right leg with no complaints concerning his left leg." The ALJ also found these limitations consistent with imaging showing a well-healed fracture in Plaintiff's right leg and Plaintiff's inability to stand for eight hours straight upon his attempted return to work. But the ALJ concluded Dr. Stokesbary "provided little to no support in the form provided[,] and the remainder of his opinion is not supported by, or consistent with, records showing improvement objectively" (citing Dr. Stokesbary's February and April 2024 treatment records and the April 2024 physical therapy discharge note).

Plaintiff argues the ALJ did not adequately explain her reasoning for rejecting some of Dr. Stokesbary's opinion (that Plaintiff's physical impairments would interfere with the attention and concentration necessary to perform simple work, that he would need to take unscheduled breaks to lie down throughout the day, and that he would miss one or two days of work a month). Plaintiff argues that the ALJ did not connect the cited evidence with the rejected portions of Dr. Stokesbary's opinion and that without this explanation, the court is left to guess why the ALJ found these limitations unsupported or inconsistent. Plaintiff notes that Dr. Stokesbary's February 2024 note and the April 2024 physical therapy treatment note address his left-knee pain, but Dr. Stokesbary's opinion was based only on his right-knee pain. Plaintiff also argues that improvement from a severe injury does not necessarily prove inconsistency with the need for additional breaks or absences, especially given his decreased ankle strength.

The ALJ adequately explained her consistency and supportability findings. The ALJ summarized the treatment records, which show Plaintiff's right leg improved such that Plaintiff was able to perform light work duties at work, but had difficulties standing all day. The treatment records do not reflect that Plaintiff ever complained of issues sitting, and indeed, on the day Dr. Stokesbary filled out the RFC form, he suggested Plaintiff look for sedentary work (as the ALJ noted). The ALJ limited Plaintiff to seated work but did not find Plaintiff would need unscheduled breaks to lie down or that Plaintiff would miss work. I recommend finding that substantial evidence supports the ALJ's RFC determination.

## *III. CONCLUSION*

I recommend **affirming** the ALJ's decision and entering judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[23] Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[24]

**DATED** November 19, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[23] **Fed. R. Civ. P. 72**.

[24] *See* ***United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).